**E.J. NOVAK and Debra Studer, Plaintiffs,**

v.

**NATIONAL BROADCASTING COMPANY, INC., Brandon Tartikoff, Broadway Video, Inc., Lorne Michaels, Dinah Minot, Don Novello, WNBC, Gaylord Production Company and Fries Entertainment Co., Defendants.**

**No. 88 Civ. 5830 (RWS).**

United States District Court, S.D. New York.

June 23, 1989.

E.J. Novak and Debra Studer, New York City, pro se.

Cahill Gordon & Reindel, P.C., New York City by Thomas R. Jones, James Sandnes, Nelson Bogart, and Sandra A. Baron, W. Drew Kastner, Jeffrey Paule, for defendants N.B.C., Brandon Tartikoff, Broadway Video and Lorne Michaels.

Pryor, Cashman, Sherman & Flynn, New York City by Stephen F. Huff, Philip R. Hoffman, of counsel, for defendants Gaylord Production and Fries Entertainment Co.

SWEET, District Judge.

Defendants National Broadcasting Company, Inc. ("NBC"), Brandon Tartikoff ("Tartikoff"), Broadway Video, Inc. ("Video"), Lorne Michaels ("Michaels"), Dinah Minot ("Minot"), WNBC (collectively, the "NBC defendants"), and defendants Gaylord Production Company ("Gaylord") and Fries Entertainment Co. ("Fries") have moved under Rule 56, Fed.R.Civ.P., to dismiss the complaint of plaintiffs E.J. Novak ("Novak") and Debra Studer ("Studer"). The defendants also seek costs and sanctions under 17 U.S.C. § 505 and Rule 11, Fed.R.Civ.P. Upon the facts and conclusions set forth below, the summary judgment motions are granted, except with respect to the cause of action based upon the Gangster scripts, and the motions for sanctions and costs are denied.

Creativity, humor, and copyrights in the entertainment world have given rise to this dispute. Specifically, Novak and Studer allege that the NBC defendants on six occasions on their television program "Saturday Night Live" ("SNL") infringed the plaintiffs' scripts portraying The Gangster, Frankenstein, and Attila the Hun. Novak and Studer have charged Gaylord and Fries with infringing a script involving The Fifth Beatle in its television program "Off the Wall." Whether there has been an appropriation of ideas, concepts, and *scenes a faire* or the theft of copyrighted and protected material is the issue which is decided below.

*The Parties*

Unlike some copyright infringement claimants who are simply aspiring show business hopefuls, Novak, a New York resident, has worked in the entertainment industry for more than twenty years as an award-winning writer, producer, and performer, a show business historian and lecturer, and former national magazine editor.

Studer, also a New York resident, has been Novak's professional show business partner for more than ten years. Together they created, wrote, produced, and starred in a series of fifteen comedy segments called "The Video Vault" on New York's WOR–TV, a national satellite superstation.

NBC, a Delaware corporation with offices in New York, is what its name implies. It has for many years broadcast SNL, an amusing, acclaimed, and well-known late-night comedy show. Tartikoff is president of NBC Entertainment, a division of NBC with offices in New York.

WNBC has no corporate identity separate from NBC. It is simply the designation of a broadcast license (VHF, FM, and AM) granted to NBC, as licensee, by the Federal Communications Commission. Video, a production company, produces SNL jointly with NBC Productions, Inc., an NBC subsidiary not named as a defendant. Michaels is president of Video and SNL's Executive Producer, and Don Novello and Minot are independent contractors who are, or have been, involved in SNL's production.

Gaylord is a California corporation with offices in Los Angeles. Fries is a Delaware corporation, also with offices in Los Angeles. They produce a comedy program entitled "Off The Wall," which is broadcast by numerous stations nationally, including NBC.

### Prior Proceedings

Counsel for Novak and Studer filed the complaint on August 2, 1988. It alleged claims of copyright infringement by Novak against the NBC defendants (Count I), unfair competition by Novak against the NBC defendants (Count II), copyright infringement by Novak against Fries and Gaylord (Count III), unfair competition by Novak against Fries and Gaylord (Count IV), and tortious interference with business relations by Novak and Studer against all the defendants (Count V).

The defendants, prior to answer, filed the instant motions seeking dismissal which were heard on March 24, 1989. In the course of that submission, Novak and Studer sharpened the dispute by withdrawing their state law claims which the defendants had attacked as preempted by the copyright claims, *see* Memo of Law in Opp. p. 28.

### The Facts

Novak and Studer are creators, performers, and compelling and attractive personalities who now are representing themselves in this action. From July 1985 through January 1986, Novak and Studer created, wrote, produced, and starred in a series of fifteen comedy segments called the "Video Vault," which were broadcast, including reruns, over eighty times nationally on WOR–TV. Novak has described the "Video Vaults" as follows:

A series of comedy vignettes highlighting fictitious interview segments from non-existent [sic] programs culled from the 32–year television career of broadcaster Joe Franklin.

Veteran talk-show host Joe Franklin, has interviewed over 100,000 guests on his daily TV show. "Joe Franklin's Video Vault" presents bizarre, fantasy encounters that never really happened on his program, but very well could have.

Some segments are presented in black and white, others in color, stimulating the look of a nostalgic clip from the "archives."

In August of 1985, Novak and Studer submitted copies of an eleven minute videotape demo of edited highlights from a handful of the "Video Vault" segments, both personally and through certain entertainment agents and executives, to NBC (including NBC Entertainment President Tartikoff), Video, Minot, and Michaels, who then were soliciting for demo tapes in consideration for employment as writers/performers for SNL. A total of eight separate videotapes were submitted (the "Audition Tapes"). The tapes were delivered by messenger and signed for by the recipients.

On November 12, 1985, Novak filed, among others, four of the Video Vault scripts for copyright purposes and obtained a valid Copyright # PAU 780 9H. They were "Marilyn Monroe and Attila the Hun," "Yucky Moosiano and Lola," "The Wicked Witch of the West & Frankenstein," and "The Singing Sister and Wingo, the Fifth Beatle." These scripts are attached as Appendix A.

Without prior response from NBC, Tartikoff in March 1986 returned the "Video Vault" tapes, which were resubmitted to NBC personnel in 1986. Also, in the spring of 1986 an agent on behalf of Novak and Studer submitted a copy of Novak and Studer's "Video Vault" demo tape to Gaylord in response to a trade paper ad soliciting for comedy writers and performers for a program called "Off The Wall."

After receiving the "Video Vault" submissions, SNL and "Off The Wall" broadcast programs that are the subject of the Novak and Studer claims. The dates of the "Video Vault" broadcasts and the allegedly infringing broadcasts were as follows:

### The Gangster

"Video Vault" broadcast twice daily on 10/7/85, 11/18/85 and 1/16/86.

SNL broadcast on 12/21/85.[1]

*Frankenstein*

"Video Vault" broadcast twice daily on 10/31/85, 11/22/85 and 3/10/86.

SNL broadcast on 12/19/87 and 5/7/88.

*Attila The Hun*

"Video Vault" broadcast twice daily on 7/10/85, 9/10/85 and 2/18/86.

SNL broadcast on 5/9/87, 8/8/87 and 7/9/88.

*The Fifth Beatle*

"Video Vault" broadcast twice daily on 11/14/85 and 2/25/86.

"Off The Wall" broadcast on 3/8/87.

The scripts of the SNL and "Off The Wall" performances are annexed hereto as Appendix B. A partial comparison of the expression of the scripts is annexed hereto as Appendix C. No comparison has been made between the entire "Video Vault" demo and the SNL and "Off The Wall" performances because Novak's copyright is limited to the scripts.

A comparison of the scripts (Appendix A & B) reveals the following:

### 1. *Attila the Hun*

Novak's Joe Franklin interview with Attila the Hun portrayed Attila as a modern-day Hun who had just flown in from a show in Vegas to play the "Concord Hotel in the Catskills." Attila was on the Joe Franklin show to promote his new book, a spin-off of the book "The Joy of Sex ... from a personal angle ... called the Joy of Pillaging." This Attila is commanding and lascivious toward the other interviewee, Marilyn Monroe.

The SNL Attila the Hun was part of "Very Smart Theater," a spoof of public television's series "Masterpiece Theater." The book being presented is "Attila: The Early Years." The audience is told, by the narrator, that young Attila is plagued by "ambivalent feelings" and "inner conflicts." The play begins at a Hun banquet where Attila's father announces that Attila will be the new leader of the Huns. The youthful Attila explains to the Huns that

he does not want to be their leader and runs from the room, confused and scared, to his "secret place" where he goes when he is feeling "sad and frightened." Attila spontaneously sings a very off-key song "Where do the Bluebirds Play." His father arrives on the scene and has a fatherly talk with Attila who explains that he would rather make a living selling mobiles made out of bones, pine cones, and string than by being the new leader of the Huns.

### 2. *Frankenstein*

In the script for Joe Franklin's interview with the Frankenstein monster and the Wicked Witch, Frankenstein greeted Franklin saying, "Joe Franklin—friend—Joe Franklin—good"; declined an invitation to be on the show again saying, "Grrrrrrrrr"; and remarked on Franklin's accidental melting of the witch saying, "Butterfingers." His voice was to be modified by an "echo" effect. No further lines or action were set forth.

SNL's Frankenstein was part of a spoof roundtable show called "Succinctly Speaking," with such well known "succinct speakers" as Tarzan, Tonto, and the Frankenstein monster. At the beginning of the script the host introduced very simplistic issues such as "fire," whereupon each participant gave an equally simplistic response such as "fire bad." When asked about bread each participant said, "bread good," although Tarzan said, "no eat bread."

The discussion moved to a more complex topic—the INF Treaty. Tarzan explained that he likes the treaty saying, "make world safer for Tarzan and Boy." Frankenstein did not understand the topic and ran off berserk busting through a wall saying "fire bad." The show ends with Tarzan, Tonto and Frankenstein singing "Away in the Manger" in pidgin English, as smoke rose from the monster's clothing.

### 3. *The Gangster*

In the Joe Franklin interview with Yucky Luciano, presumably a spoof of the famous

---

**1.** According to Studer and Novak, this broadcast followed the submission of the Audition Tape to

Tartikoff by two weeks.

gangster "Lucky Luciano," Yucky explained that he was on the show to "refute these vicious rumors about the existence of a so-called 'organized crime' syndicate, which we all know *simply does not exist.*" (emphasis in original). When the camera showed Franklin's face it was to be covered "with black square mask wiped or supered"—*i.e.,* a black box over his eyes. Yucky belatedly discovered that Franklin's face, not his own, was hidden by the "black thing," whereupon Yucky was to be machine-gunned to death from off stage. The interview ended with Yucky's female companion, "Lola," attempting to arrange a date with Franklin since Yucky is dead.

The SNL gangster is part of the well-known "Weekend Update" spoof news broadcast. As part of the "coverage of the recent Mafia killing," the news anchor interviewed a person claiming to be an informant, referred to as "Mr. X." The anchor indicates that Mr. X, played by Novello, wants to make a statement about his mob connection. Mr. X explains that he was a "graduate, with honors, almost, from The Mafia Training School." Mr. X had accepted employment as a Mafia trainee for $300 per week. However, he was demoted to the mailroom and not paid the promised $300 when he accidentally lost the Don's wife. When asked about the recent murder, Mr. X explains that he "witnessed" it—witnessed it on Nightline with Ted Koppel. During the interview the cameraman's attempts to mask Mr. X's eyes with a black box are foiled by the bobbing and waving of the character's head, thereby exposing Mr. X's features. The news story ends with the disappointed anchor sarcastically saying, "Mr. X: A virtual fountain of Mafia information."

### 4. *The Fifth Beatle*

The Fifth Beatle script involved a fictitious interview with Wingo Murray, whom the interviewer refers to as the "Fifth Beatle." The script portrays Murray as an oboe player who claimed actually to have been a member of the Beatles for five hours, during which time he wrote all their songs.

The "Off The Wall" script involved an interview with Cyril Brorchard, whom the interviewer says "has often been called the fifth Beatle because of his incredible knowledge of the Beatles." The ensuing interview reveals that Brorchard in fact knows little or nothing about the Beatles. He does not know that this month marks twenty-five years since the Beatles got together. He missed the Beatles' American television debut on The Ed Sullivan Show because he was watching "Maverick" on another channel instead. He does not even recognize "John, Paul, George, and Ringo" as referring to the Beatles.

Both scripts feature a Fifth Beatle, in the Novak script a braggart who composed the songs and did it all, in the "Off The Wall" script a pretender who knew nothing about the Beatles. The comedic device is the Fifth Beatle, with or without knowledge.

The principal similarities between the two scripts are the interview format and the use of the term the "Fifth Beatle." However, that term has enjoyed wide currency elsewhere. Billy Preston, a performer, was referred to as the "Fifth Beatle" in the Washington Post of August 31, 1986. George Best, a soccer player, was referred to as the "Fifth Beatle" in a UPI release of December 17, 1974. Pete Best, a drummer, was referred to as the "Fifth Beatle" in the Financial Times of August 20, 1988. Murray the K Kaufman, a disc jockey, was referred to as the "Fifth Beatle" in a January 1983 Time Special Issue for 1982. Yoko Ono has been referred to as the "Fifth Beatle" in articles in the Washington Post on December 9, 1980 and the Associated Press on December 9, 1980. John Lamont, an alleged counterfeiter, was referred to as the "Fifth Beatle" in the Washington Post on March 9, 1980. George Martin, an arranger and producer, was referred to as the "Fifth Beatle" in The Times Mirror on December 31, 1987.

Although there is no direct evidence of copying, Novak and Studer have established that the defendants had access to their work. For clarity of analysis, it can be inferred that the defendants in prepar-

ing the SNL and the "Off The Wall" performances were aware of the Audition Tapes and are presumed to be aware of the copyrighted scripts.

*Conclusions of Law*

Because access to copyrighted material has been established under the facts as found above, what remains to be determined is whether or not there is substantial similarity between the Studer and Novak scripts and the SNL and "Off The Wall" performances.

*Summary Judgment With Respect To Copyright Claims*

It is settled that "[j]ust as copying is an essential element of infringement, so substantial similarity between the plaintiff's and defendant's works is an essential element of copying." 3 *Nimmer on Copyright,* § 13.03[A], at 13–20 (footnotes omitted) (citing *Ideal Toy Corp. v. Fab–Lu Ltd.,* 360 F.2d 1021 (2d Cir.1966)); *see also Warner Bros., Inc. v. American Broadcasting Cos.,* 654 F.2d 204, 207 (2d Cir. 1981) ("*Warner I*"); *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir.1946) ("if there are no similarities, no amount of evidence of access will suffice to prove copying").

■ Summary judgment can be granted by comparison between Novak's copyrighted material and the allegedly infringing skits if no reasonable finder of fact could find that the works are "substantially similar." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As the Second Circuit explained in *Warner Bros., Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 240 (2d Cir. 1983) ("*Warner II*"), "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work,' or because no reasonable jury, properly instructed, could find that the two works are substantially similar" (citing *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 918 (2d Cir. 1980)).

■ The general test for determining substantial similarity is "[w]hether an aver-age law observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp.,* 360 F.2d at 1022. Similarities shared by the works must be "more than mere generalized ideas or themes." *Walker v. Time Life Films, Inc.,* 784 F.2d 44 (2d Cir.1986), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). Plaintiff must show that his expression was improperly appropriated by proving that the similarities related to copyrightable material. *See id.,* 784 F.2d at 48; *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Arnstein,* 154 F.2d at 468; *Davis v. United Artists, Inc.,* 547 F.Supp. 722, 723 (S.D.N.Y.1982).

*The Claim For Copyright Infringement Is Limited Solely To The Copyrighted Scripts*

■ Novak and Studer have claimed that the defendants infringed the Audition Tapes containing the "Video Vault" sketches. However, Novak registered only the scripts of the "Video Vault" sketches, and not the performances of such sketches. On this record, there has been no finding that Novak has any copyright covering such sketches or that Novak has an ownership interest in the performances.

Section 411(a) of the Copyright Act, 17 U.S.C. § 101 *et seq.,* provides, in relevant part:

[N]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.

Thus, the registration of the copyright for the performance is an absolute prerequisite to the institution of an infringement suit alleging that the copyrights in such performances have been infringed. Without such a registration, Novak's claims about elements relating solely to the performances, as opposed to the scripts, are not an element of infringement, whatever evidentiary value they may have with respect to access and intent. *See Jones v. Virgin Records Ltd.,* 643 F.Supp. 1153 (S.D.N.Y. 1986); *Conan Properties, Inc. v. Mattel,*

*Inc.*, 601 F.Supp. 1179, 1182 (S.D.N.Y. 1984); *Strout Realty, Inc. v. Country 22 Real Estate Corp.*, 493 F.Supp. 997, 999 (W.D.Mo.1980); *Burns v. Rockwood Distrib. Co.*, 481 F.Supp. 841, 845 (N.D.Ill. 1979); *International Trade Management, Inc. v. United States*, 553 F.Supp. 402, 403 (Ct.Cl.1982).

In short, what is required here is a review of the scripts of the sketches at issue.

Notwithstanding the absence of a copyright interest in the Audition Tapes' television performances, Novak and Studer assert that the comparison between the two television performances is the appropriate comparison because, as they put it:

> Regarding the conflict of "videotapes vs. scripts," the video recording and transmission of a comedy sketch is merely the performance and culmination of the details, directions, dramatic devices, technical effects, comic ideas and dialogue found in the scripts.

> "TV dramatization of copyrighted script is 'derivative work.'" *Gilliam v. American Broadcasting Co.*, (1976), (CA2) 192 USPQ 1 [538 F.2d 14].

> "Copying substance of copyrighted design produced through different medium is prohibited." *Walco Products v. Kittay & Blitz* (1972, D.C.N.Y.) 354 F.Supp. 121.

> "Plaintiff's copyright in underlying scripts of Lone Ranger drama tapes includes right to prepare derivative works, which is infringed by defendant's duplicating, remixing and distribution." *Long [Lone] Ranger Television, Inc. v. Program Radio Corp.*, (1984, CA9 Cal) 740 F.2d 718, 223 USPQ 112.

Memo of Law in Opp. p. 9–10.

However, it is the scripts that were copyrighted and it is the scripts that must be infringed for Novak and Studer to recover, whether by the SNL and "Off The Wall" scripts or performance.

*Ideas and Scenes a Faire Not Subject to Copyright*

A copyright does not protect ideas; it protects only the expression of those ideas. *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 544, 105 S.Ct. 2218, 2222, 85 L.Ed.2d 588 (1985). Indeed, "it is axiomatic that copyright protection extends only to the expression of the author's idea, not to the idea itself." *Warner I*, 654 F.2d at 208 (citations omitted).

By granting protection to a particular expression of an idea but not a monopoly on the idea itself, the law encourages a writer, artist, or producer to devote his time and talents to conceiving and developing ideas, safe in the knowledge that if he attempts to profit by placing them into the marketplace his expression of the idea will be protected, "while at the same time permitting the nation to benefit from further improvements or progress resulting from others' use of the same subject matter." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976).

In determining whether two works are so "substantially similar as to reveal an infringement of one by the other, courts must decide whether the similarities shared by the works are something more than mere generalized ideas or themes." *Warner I*, 654 F.2d at 208. The court must "distill the nonprotected idea from the protected expression." *Reyher*, 533 F.2d at 91.

A corollary of the idea/expression dichotomy is the concept of *scenes a faire*, that is, " 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic.'" *Hoehling*, 618 F.2d at 979 (quoting *Alexander v. Haley*, 460 F.Supp. 40 (S.D.N.Y.1978). The Second Circuit has held that *scenes a faire* are not copyrightable as a matter of law "[b]ecause it is virtually impossible to write about a particular historical era or fictional theme without employing certain 'stock' or standard literary devices." *Id.* at 979.

The Court held in *Reyher* that a copyrighted children's book was not infringed by another work, notwithstanding the fact that both works presented the same thematic concept of a lost child describing its

mother to strangers as the most beautiful woman in the world. After a search based on that description fails, a homely woman turns out to be the mother and they are finally reunited. The court pointed out that even such similarity of events may be considered *scenes a faire*, scenes which necessarily result from identical situations particularly where the "two stories are not similar in mood, details or characterization." 533 F.2d at 92.

Likewise, *Gibson v. CBS, Inc.*, 491 F.Supp. 583, 585 (S.D.N.Y.1980), concerned two works that both were based on the similar (unprotectable) idea of personifying an egg and attributing human qualities to it. This court held that common occurrences such as lying under a chicken, sitting in a refrigerator, and facing the possibility of being scrambled or fried are "fairly predictable and usual in the life of an egg," *id.* at 586, and thus were uncopyrightable *scenes a faire. See also, e.g., Walker*, 784 F.2d 44, 50 ("Elements such as drunks, prostitutes, vermin and derelict cars would appear in realistic work about the work of a policemen in the South Bronx"); *Warner I*, 654 F.2d at 210 (both super heroes shown lifting a car with one hand is a stereotypical means of demonstrating great strength).

As stated earlier, after the court "distills out" the unprotectable ideas and *scenes a faire*, the court must determine "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work," *Ideal Toy*, 360 F.2d at 1022. "[I]t has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher*, 533 F.2d at 91.

In *Walker*, one work called "Fort Apache" was a book which recounts the life of a policeman in the 41st precinct in the South Bronx. The allegedly infringing work called "Fort Apache: The Bronx" was also about the life of a policeman in the 41st precinct. Both "begin with the murder of a black and a white policeman with a handgun at close range; both depict cockfights, drunks, stripped cars, prostitutes and rats; both feature as central characters third or fourth-generation Irish policemen who live in Queens and frequently drink...." 784 F.2d at 50. Yet the Second Circuit held that no reasonable finder of fact could conclude that they were substantially similar.

Again in *Warner II*, 720 F.2d 231, the Second Circuit upheld summary judgment due to a lack of substantial similarity. In that case, plaintiff alleged that defendants' superhero infringed the Superman character. Both works involved a superhero who wore tights and a cape and led "double lives." Both could fly through the air and were impervious to bullets. Yet, the Second Circuit agreed with the district court that summary judgment was appropriate as a matter of law.

Likewise, in *Hoehling*, 618 F.2d 972, the court upheld summary judgment against a claim of an author who wrote a book theorizing that one Eric Spehl, influenced by his girlfriend sabotaged the dirigible Hindenberg by placing a bomb in "Gas Cell 4." Despite the admitted fact that the second work also theorized that Spehl sabotaged the Hindenberg due to influence from his girlfriend, by placing a bomb in "Gas Cell 4," the court upheld judgment as a matter of law. *See also, e.g., Zambito v. Paramount Pictures Corp.*, 613 F.Supp. 1107 (E.D.N.Y.1985) (swashbuckling archaeologist not substantially similar to Indiana Jones), *aff'd without op.*, 788 F.2d 2 (2d Cir.1985).

Attila the Hun is a historical figure and may be freely used by anyone. *See, e.g., Harper & Row*, 471 U.S. at 556, 105 S.Ct. at 2228. *Hoehling*, 618 F.2d at 978. The Frankenstein monster is the original character created by Mary Shelley (or rather Dr. Frankenstein) whose work has passed into the public domain and may be used by anyone. Yucky is either a spoof of Lucky Luciano, a historical figure who, like Attila, is not of Novak's creation, or a spoof or a "Godfather" style character which is merely a generalized idea. A fictional "Fifth Beatle" is simply a concept, an idea, which

has been used for various purposes in entertainment as set forth in the facts found above.

*No Infringement Has Been Established With Respect To The Attila, Frankenstein, And Fifth Beatle Sketches*

Attila the Hun

██ Novak and Studer's Attila is a modern-day Hun who has just flown in from Las Vegas to play the Catskills. In the talk-show format, his dialogue is self-confident and even cocky, while the format of the SNL skit is a comedic theatrical production and is set in ancient times. The SNL Attila is a "sad and frightened" artist, a pacifist who eschews violence and leadership, preferring to sing tender, off-key ballads about bluebirds and to create mobiles. The elements of the two skits have nothing in common other than the idea of Attila.

Frankenstein

Novak and Studer's Frankenstein appears in the context of a Johnny Carson style talk-show/Halloween special and speaks only eight words. The SNL skit portrays Frankenstein in a panel discussion with Tarzan and Tonto. The SNL Frankenstein, like the original Hollywood movie monster, gets angry when he is unable to understand, goes berserk, and fears fire. The overall feel of the two formats is different, as is the management of elements, use of characters, and selection. Any similarity in the portrayal of the characters, their mannerisms, simplistic dialogue, costumes, and the like is *scenes a faire*.

The Gangster

██ Plaintiff's gangster interview raises an issue of fact regarding the substantial similarity test. Novak and Studer's gangster appeared in the interview to deny the existence of organized crime, and is machine-gunned to death because the camera mistakenly superimposes a mask over the interviewer, not the gangster. The SNL interview involved an Italian–American character who "witnessed" a shooting by watching Ted Koppel's "Nightline." Mr. X was an incompetent and disgruntled would-be mobster, in no need of protection, using a camera mask technique which failed completely to hide his eyes.

In the SNL skit the mask was on the correct person and the "gag" was both in the way the characters bobbed in and out of the "mask's" protection and in the audience's realization that there was no need for the mask in the first place. In the Audition Tape and the Novak and Studer script, a "real" mobster was "rubbed out" on camera because of the mistake of masking the interviewer, not the gangster. The "black box" mask was on Joe Franklin. The SNL mask was on the right person, whereas, the Novak and Studer mask was on the wrong person.

The black box device cannot properly be regarded as a *scene a faire*. Although Novak and Studer cannot appropriate all pervasive use of the "black box," comedic or otherwise, a question of fact remains as to whether the use of the black box by the NBC defendants is substantially similar to the use described in the Novak and Studer script.

The Fifth Beatle

The dialogue of Novak and Studer's sketch relating to the "Fifth Beatle" bears insufficient similarity to that of the "Off The Wall" segment to create a factual issue. Novak's sketch concerns a man, Wingo Murray, who claims to have been a Beatle, while Cyril Brorchard, the person in the "Off The Wall" segment is merely a fan. Wingo talks about how he wrote all the Beatles' songs. The topic of discussion with Cyril, however, is for the most part limited to the Beatles' arrival in the United States in the mid–1960s and their appearance on the Ed Sullivan Show. Wingo knows everything about the Beatles, while Cyril knows nothing. The settings for the interviews are different. Thus, while Wingo is merely one of two guests (the Singing Sister being the other) who is interviewed on a talk show by Joe Franklin, the interview with Cyril is one on one. Other than the common idea of having an interview with someone referred to as the "Fifth Beatle," the two sketches are not substantially similar. The similarities of clothing

and attitude are part of a Beatle *scenes a faire.*

*Conclusion*

For the reasons set forth, summary judgment is granted dismissing the complaint, except with respect to the cause of action based upon The Gangster scripts. Novak and Studer are granted leave to replead this cause of action.

The motion for sanctions is denied based on the considerations discussed above. Discovery will be completed by September 6 and the pretrial order filed September 13, 1989.

It is so ordered.