**E.J. NOVAK and Debra Studer, Plaintiffs,**

v.

**NATIONAL BROADCASTING COMPANY, INC., NBC Productions, Inc., Brandon Tartikoff, Broadway Video, Inc., Lorne Michaels, Dinah Minot, and Don Novello, Defendants.**

**No. 88 Civ. 5380 (RWS).**

United States District Court, S.D. New York.

Dec. 5, 1990.

E.J. Novak and Debra Studer, New York City, pro se.

Cahill Gordon & Reindel (Thomas R. Jones, James Sandnes, Judith A. Archer, and Sandra A. Baron, Gayle Chatilo Sproul, Nat. Broadcasting Co., Inc., New York City, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendants National Broadcasting Company, Inc., NBC Productions, Inc., Brandon Tartikoff, Broadway Video, Inc., Lorne Michaels, Dinah Minot, and Don Novello (collectively, the "NBC Defendants") have moved for summary judgment pursuant to Fed.R.Civ.P. 56 of the outstanding copy-

right infringement claims of plaintiffs *pro se* E.J. Novak and Debra Studer's ("Novak and Studer"). For the reasons set forth below, the NBC Defendants' motion for summary judgment is granted.

*The Parties*

Novak is a writer, producer, performer, show business historian and lecturer, and former national magazine editor. Studer is Novak's professional show business partner. Together they created, wrote, produced, and starred in a series of fifteen comedy segments called "The Video Vault" on New York's WOR–TV, a national satellite superstation. Both are New York residents.

Defendant NBC, a Delaware Corporation with offices in New York, has for many years broadcast Saturday Night Live ("SNL"), an acclaimed late-night comedy show. Defendant NBC Productions, a subsidiary of NBC, also has offices in New York.

Defendant Brandon Tartikoff, during the time of the events giving rise to this dispute, was president of NBC Entertainment, a division of NBC with offices in New York.

Defendant Broadway Video, Inc. ("Broadway Video"), a production company that produces SNL jointly with NBC productions, is a New York Corporation with its principal place of business in New York. Defendant Lorne Michaels is president of Broadway Video and the Executive Producer of SNL. Defendants Don Novello and Dinah Minot are independent contractors who are, or have been, involved in SNL's production.

*Prior Proceedings*

On August 2, 1988, Novak and Studer filed a complaint against NBC alleging various claims of copyright infringement, unfair competition and tortious interference with business relations.

The defendants, prior to answer, filed motions seeking summary judgment pursuant to Fed.R.Civ.P. 56. These summary judgment motions were heard on March 24, 1989 and, in an opinion of June 23, 1989, (the "first summary judgment opinion"), this court granted defendants' motions for summary judgment with respect to all but one copyright infringement claim against the SNL defendants involving a skit about a gangster performed on SNL (the "SNL gangster skit").

On July 12, 1989, the SNL Defendants moved pursuant to Local Rule 3(j) and Rules 56 and 60(b), Fed.R.Civ.P., for an order granting reargument on certain portions of the first summary judgment opinion, and upon reargument, amending, among other things, 1) the first summary judgment opinion to clarify the court's holdings regarding certain findings of fact, and 2) granting summary judgment dismissing the remaining copyright infringement claim.

Novak and Studer moved pursuant to Rules 15(a), 21, and 4(j), Fed.R.Civ.P., for an order that would allow them to, among other things, 1) amend their complaint to add two additional counts of copyright infringement, and 2) add NBC Productions as a defendant. The court granted the Plaintiffs' motions, and granted the first part of the Defendants' motion, but denied the Defendants' renewed request for summary judgment.

On August 14, 1990, the Defendants filed this summary judgment motion seeking dismissal of the infringement claim based on the performance of the SNL gangster skit and of the infringement claims introduced into this litigation following the court's grant of Plaintiffs' July 12 motion.

*The Facts*

Novak and Studer are writers and performers. From July, 1985 through January 1986, Novak and Studer created, wrote, produced and starred in a series of fifteen comedy segments called the "Video Vault," which were broadcast nationally on WOR–TV.

Each "Video Vault" episode is a fictional talk show interview, filmed for the most part in black and white so as to appear to be archival footage. The fictional interviews, hosted by veteran talk show personality Joe Franklin, contain dialogues with and appearances by characters ranging

from actual historic figures (*e.g.*, Marilyn Monroe, Albert Einstein) to original and mythical types (*e.g.*, Frankenstein, a "Fifth Beatle," and mobster "Yucky Moosiano"), who, even if they truly existed, could or would never have appeared on television or on a talk show.

In August of 1985, Studer called Broadway Video and spoke to talent assistant Julian Ford who told her that Broadway Video and NBC were accepting audition tapes and scripts with a view toward hiring new performers/writers for the upcoming 1985–86 season of SNL. Ford told her to submit tapes to Broadway Video and to Dinah Minot, casting director at NBC.

Novak and Studer subsequently prepared a demonstration tape of highlights from certain copyrighted "Video Vault" episodes (the "first demo tape") and hand-delivered copies to both Michaels at Broadway Video and to Minot at NBC. Novak and Studer received and retained signed messenger receipts for both deliveries. Pursuant to § 401 of the Copyright Act, the demo tape and its box label displayed a notice of copyright. The tapes were never returned to Novak and Studer from either source.

After Novak and Studer had sent the copies of the first demo tape to Michaels and Minot, the pair continued to tape additional "Video Vault" episodes broadcast nationally on WOR–TV. Among these additional episodes were a skit featuring a gangster character called "Yucky Moosiano" skit (the "Video Vault gangster skit") and a skit portraying a character called Wingo Murray who claimed to be the fifth member of the Beatles rock group, (the "Video Vault Fifth Beatle skit"), the subjects of the infringement action before this court. Novak and Studer taped these skits on September 25, 1985 and November 6, 1985, respectively. WOR–TV broadcast the Video Vault gangster skit twice on November 18, 1985 and twice on January 16, 1986. WOR–TV broadcast the Video Vault Fifth Beatle skit twice on November 14, 1985 and twice on February 25, 1986.

Pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.* Novak registered the "Video Vault" scripts, including detailed technical and narrative material, in the Copyright Office of the United States, effective November 12, 1985. Studer and Novak each own a fifty percent interest in the copyright.

Having received no response from either NBC or Broadway Video by November 1985, Novak and Studer decided to submit a revised, updated version of the demo tape (the "updated demo tape") directly to Tartikoff. The updated demo tape, eleven minutes in length, included, among other items, the Video Vault gangster skit and the Video Vault Fifth Beatle skit.

On December 2, 1985, Studer hand-delivered to NBC a copy of the updated demo tape, together with a cover letter to Tartikoff and a copy of Novak's resume, in a WOR–TV labeled envelope addressed to Tartikoff. Studer received a signed messenger receipt from an NBC employee showing receipt of the submission.

On December 21, 1985, SNL aired the SNL gangster skit.

Novak and Studer received no response from Tartikoff regarding the submission of the updated demo tape until March 20, 1986, when the tape was returned with a note typed on Tartikoff's personal memorandum letterhead reading, "We found this in our office and thought you might like it back." The package containing the tape was postmarked and mailed from NBC's offices in Burbank, California.

The parties dispute whether Tartikoff actually viewed the contents of the updated tape, whether Tartikoff passed on the tape to Michaels or Minot, and whether Tartikoff, Michaels, Minot or Novello saw the broadcasts of the Video Vault gangster or Fifth Beatle skits.

In 1986, agent James Sarnoff viewed the updated demo tape, and submitted two copies of the updated tape, one to Michaels at Broadway Video and one to Minot at NBC. In 1986, personal manager and NBC executive producer Jack Rollins viewed the updated demo tape, and gave the tape to another agent who in turn submitted the tape to SNL.

On October 15, 1988 and on December 15 of that same year, NBC broadcast the SNL Fifth Beatle skit.

*Discussion*

■■■■ A copyright plaintiff, in order to establish a prima facie case of infringement, must prove ownership of a valid copyright and that the defendant copied the protected work. *Warner Bros. v. American Broadcasting Cos.*, 654 F.2d 204, 207 (2d Cir.1981). The Defendants do not dispute ownership for the purposes of this motion, contesting only the copying claim. Absent direct evidence of copying, a rarity in infringement cases, copying may be inferred if the plaintiffs prove (i) that defendant had access to the copyrighted work *and* (ii) that the alleged infringing work is substantially similar to plaintiff's. *Id.*, at 207.

■■ If a plaintiff raises an inference of copying based on this two-pronged test, a defendant may, nonetheless, rebut this inference either directly or by demonstrating that it independently created the accused work either without reference to the plaintiff's work, or by copying a work already in the public domain. *Gund, Inc. v. Russ Berrie & Co.*, 701 F.Supp. 1013, 1018 (S.D. N.Y.1988).

■■ On a motion for summary judgment, the plaintiff must show a dispute about the "facts that might affect the outcome of the suit under governing law ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *motion denied*, 480 U.S. 903, 107 S.Ct. 1343, 94 L.Ed.2d 515 (1987). In addition, the dispute about the facts must also be genuine, *i.e.*, "a fair minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 257, 106 S.Ct. at 2514–15. Thus, under the *Anderson* standard, while a factual dispute about either of the two prongs, access or substantial similarity, would affect the outcome of the case, such a dispute must be genuine.

■■ With regard to the substantial similarity prong, a court may grant summary judgment for defendants by comparing the copyrighted material with the allegedly infringing skits if no reasonable finder of fact could find that the works are "substantially similar." *Anderson*, 477 U.S. 242, 106 S.Ct. 2505 (1986); *cf. Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983) ("a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work' or because no reasonable jury, properly instructed, could find that the two works are substantially similar.") (citing *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir.1980)).

As to the issue of access, the standards for summary judgment are those followed by the Second Circuit in other matters. The moving party has the burden of demonstrating the absence of any material issue as to all the material facts, and the non-moving party is entitled to the benefit of all favorable inferences that may be drawn from the evidence. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir.1980). But the possibility that a factual dispute may exist, without more, is not enough to overcome a convincing presentation by the moving party. Rather, the non-moving party must bring to the court's attention "some affirmative indication that his version of relevant events is not fanciful." *Id.* at 445. To support a finding of access on a motion for summary judgment, the plaintiff must show "a reasonable possibility of access, not a bare possibility ...". *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir.1978) (quoting 3 M. Nimmer, Copyright § 13.02[A] (1978)).

A. *The Gangster Skit Claim*

1) Access

Since the first summary judgment opinion, the facts relating to whether the defendants had access to plaintiffs' gangster skit script through viewing of their submitted tapes have altered somewhat in light of evidence developed during discovery. It is now undisputed that the first demo tape sent to Minot and Michaels in August of

1985 did not contain performances of the copyrighted scripts at issue in this motion. The only remaining means of access to the gangster script are therefore the updated demo tape sent to Tartikoff on December 2, 1985 and WOR–TV's broadcasts of performances of the gangster script on several occasions commencing in November, 1985.

### a) *Access Via the Submission of the Updated Tape*

■ Tartikoff contends that he never personally reviewed the updated demo tape. In support of this contention, the defendants have introduced the deposition of Tartikoff and an affidavit from Barbara Barry, Tartikoff's secretary. According to Tartikoff's deposition, it is Tartikoff's policy never to look at unsolicited submissions. Tartikoff's secretaries customarily forward such submissions either to his Burbank or his New York city office, depending upon his whereabouts at the time of receipt. When the submissions pile up, Tartikoff's secretaries check with him to make sure he does not want to look at any of them, and then send back the submissions to the senders, often with a typed note acknowledging the return. The affidavit of Barbara Barry states that Tartikoff's policy is to compose and sign a note to those who submitted tapes that Tartikoff actually viewed. When Tartikoff does not view a tape, it is office policy to enclose a typed note similar to the note sent to Novak and Studer.

As evidence of their version of the facts, that Tartikoff received and reviewed the updated demo tape, Novak and Studer submit a deposition of Tartikoff taken in an earlier litigation matter in which Tartikoff states that it is NBC's policy to send all unsolicited manuscripts to an arm of NBC's legal department whence they are returned to the senders.

Thus, the question becomes whether Tartikoff's method of returning the tape to Novak and Studer was a deviation from policy sufficient to raise a genuine issue of fact as to whether Tartikoff viewed the tape. The Defendants' reply papers reconcile the apparent existence of two policies: NBC follows the procedure of routing through the legal department in the case of written manuscripts; in the case of tapes (as opposed to manuscripts) sent to Tartikoff, his own secretaries handle the processing and return.

Given that the Defendant's reply papers present an explanation of this dual policy that is consistent with Tartikoff's version of the facts, and that Novak and Studer present no affirmative evidence that Tartikoff viewed the tapes, Novak and Studer do not succeed in raising a genuine question of fact as to Tartikoff's access to the gangster skit script by means of the updated tape.[1] Therefore, the degree of Tartikoff's influence and control over the content of SNL, in so far as this issue goes to prove that Tartikoff could have communicated the contents of the tapes to Michaels, Minot or Novello, is immaterial. Also immaterial is the question of whether or when Michaels, Minot or Novello received the first demo tape, as none of the infringed scripts was performed on this first tape.

### b) *Access through Broadcasting*

■ Given that the tapes sent to Michael and Minot in August did not contain performances of the gangster skit script, and

---

**1.** In *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 854 (2d Cir.1981) a question of fact was found to exist sufficient to preclude summary judgment. Thereafter, following an eleven day trial, the jury returned a verdict for the defendant after two hours of deliberation. Even assuming that Tartikoff's access is a question of material fact under this standard, however, summary judgment is still appropriate where the Defendants have shown, to the exclusion of any questions of fact, that the gangster skit was independently created. *See infra* discussion at A(2).

Moreover, the Supreme Court has in the interim since the *State Teachers* decision reaffirmed the value of pretrial resolution of cases in appropriate circumstances. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As the Supreme Court observed in *Celotex:* "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1).

that Tartikoff, not having viewed the tapes, could not have shown them to Michaels and Minot, the only possible remaining means of access for Michael and Minot was through the broadcast of the skit on WOR–TV. The gangster skit script was performed four times on WOR–TV.

Tartikoff, Novello, Minot and Michaels when shown the tapes containing performances of the gangster skit script during their depositions, denied having ever seen the performances before.

Novak and Studer, for their part, submit no evidence of the Defendants' having viewed the Video Vault gangster skit on WOR–TV other than stating that the Joe Franklin show is viewed nationally and that the Defendants had the opportunity to watch the skits in question.

Admittedly, direct evidence about the Defendants' television viewing habits is difficult for plaintiffs to produce. No doubt in part to deal with this difficulty, the Second Circuit has recognized that a plaintiff may establish access where there has been "wide dissemination" of a copyrighted work. *ABKCO Music, Inc., v. Harrisongs Music, Ltd.*, 722 F.2d 988, 998 (2d Cir.1983). In *ABKCO*, however, the infringed work was a song that had been "Number One on the Billboard Charts" for five weeks in the United States and one of the "Top Thirty Hits" for seven weeks in England. The broadcast of the Video Vault gangster skit four times on WOR–TV does is not a comparable level of dissemination. The Video Vault gangster skit was, moreover, only broadcast twice before the allegedly infringing performance on SNL on December 21, 1985.

Under the *Ferguson* standard for the consideration of evidence relating to access for the purposes of a summary judgment motion, moreover, the Plaintiffs' assertions that the Defendants could have watched the skits on WOR–TV does not amount to a genuine issue of fact. In *Ferguson,* on a motion for summary judgment for an infringement claim involving a musical composition, the defendants produced an affidavit of defendant stating that he had never heard of plaintiff's composition. The

plaintiff adduced no evidence contradicting the defendant's statement. The court upheld the lower court's grant of summary judgment on the grounds that the plaintiff must show "a reasonable possibility of access—not a bare possibility." *Ferguson* 584 F.2d 111, 113. Novak and Studer therefore do not raise to the level of a genuine issue of fact the defendants' access to the Video Vault gangster skit script through broadcasting.

### 2) Independent Creation

■ Even assuming access and substantial similarity—a prima facie case of copying under the standards described above—the Defendants have submitted in their supporting papers evidence that the ideas for their allegedly infringing skits came from sources other than the Video Vault skits. If the Defendants' evidence can show that the allegedly infringing skits originated through the independent creation of their writers, then the question of Tartikoff's, Novello's, Minot's and Michaels' access to the copyrighted scripts though broadcast on the Joe Franklin show is no longer an issue of material fact, as the Defendants will have rebutted the prima facie case of copying. *Gund,* 701 F.Supp. at 1018.

■ The Defendants' evidence here supports a finding of independent creation in the claim based on the gangster skit. The Defendants have submitted a tape of an early sketch written by Don Novello featuring an interview with a gangster character.

In 1973, Novello wrote and performed a skit featuring a mock interview between a television personality and a gangster as part of Willy Boy Walker's *"The Weekend Tapes,"* an early home-video comedy television program shown at the Whitney Museum in New York. The topics covered in the interview, and indeed many of the words and jokes, are identical to those in the allegedly infringing SNL skit. Both skits involve an interview of an unidentified disguised man claiming to be an informant of the Mafia. Both Novello gangsters were graduates of the "Mafia Train-

ing School" and worked for "Don Tartufo." There are other similarities of dialogue, too numerous to list here, that establish that the 1973 skit is the precursor of the allegedly infringing SNL gangster skit. The defendants support the existence of this precursor with clippings from press releases and reviews surrounding the showing of the "Weekend Tapes" at the Whitney in 1976.

Defendants also address with an affidavit the one similarity between the allegedly infringing SNL gangster skit and the Video Vault gangster skit which this court in its first summary judgment opinion held to be an issue of material fact: the device of the black box. In both the SNL gangster skit and the Video Vault gangster skit, a black box covers the face of one of the participant in the interview, preventing identification by the audience. In the SNL skit, the black box unsuccessfully covers the face of the gangster. In the Video Vault skit, the box covers the face of the interviewer. The humor in the SNL skit results from the box's inability to cover the gangster's bobbing head. In the Video Vault skit, the black box is on the interviewer, not the gangster who needs the disguise.

Novak and Studer rely on the black box as the main evidence of substantial similarity of the SNL gangster skit to the Video Vault gangster skit. The Defendants assert that Novello got the idea for the black box gag from two Canadian colleagues—Ken Finkleman and Rick Moranis—with whom he worked on a show called the *Wednesday Report*. In their reply papers the Defendants submitted an affidavit from Finkleman recalling his use of the black box and stating that he and Novello in their time working together had many occasions to share comedic devices and other tips for plying their trade.

A finding of independent creation is justified despite the similarities of the two black boxes where the defendants have adduced evidence supporting their version of the origin of the idea for the gangster skit and the black box. This amount of evidence is in addition to the substantial dissimilarities that exist between the allegedly infringing skit and the Video Vault skit, differences which need not be enumerated here given the strong evidence of independent creation. Thus, the support for Defendants' version of the facts is in contrast to the case in *Gund*, where the court denied summary judgment for the defendants, holding that defendant did not meet the standards for independent creation.

In *Gund*, the defendant adduced evidence from a deposition that he asked a third party located in Korea to develop the allegedly infringing product. The court held that this was insufficient to show independent creation where none of the defendants was present when the independently created item was designed and none of them had any knowledge about what was used to develop the product. By contrast, in the instant case, defendant Novello himself (and not a third party) created the purported model for the SNL gangster skit. The defendants introduced, moreover, a supporting affidavit that illuminates the creative process resulting in the SNL gangster skit. Therefore, even assuming access and substantial similarity, the Defendants have shown conclusively that the SNL gangster skit was independently created.

### B. *The Fifth Beatle Skit*

#### 1) Access

As the Video Vault Fifth Beatle Skit was on the updated demo tape along with the Video Vault gangster skit, and was broadcast on WOR–TV the same number of times as the gangster skit, the findings of fact set forth above apply to the Defendants' access to the Fifth Beatle Skit script through submission to Tartikoff and through broadcasting as it made with regard to the gangster skit script. But because the allegedly infringing Fifth Beatle skit was broadcast on SNL in December of 1988, after Novak and Studer resubmitted the updated demo tape to NBC through two agents, there remains a possible question of fact as to whether the Defendants had access to the script of the Video Vault Fifth Beatle skit through these resubmissions.

The Defendants point again to their depositions in which Tartikoff, Michaels, Minot, and Novello deny ever having seen the Video Vault Fifth Beatle skit. In addition, the Defendants have submitted affidavits from the writers of the SNL Fifth Beatle skit stating that they never saw the updated demo tape.

Novak and Studer assert that the Defendants had access to their Fifth Beatle script through the copy Defendants obtained through the Library of Congress after this litigation began in August of 1988 with respect to the gangster skit claims.

2) Substantial Similarity

■ Even assuming access, however, the disparities between the SNL Fifth Beatle skit and the Video Vault Fifth Beatle skit are great enough to preclude a finding of substantial similarity under the *Warner Bros.* standard which says that "a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work' or because no reasonable jury, properly instructed, could find that the two works are substantially similar". *Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 240 (2d Cir.1983) ("*Warner II*").

The Video Vault Fifth Beatle script portrays a fictitious interview with Wingo Murray, whom the interviewer refers to as the "Fifth Beatle." The script depicts Murray as an oboe player who claimed actually to have been a member of the Beatles for five hours, during which time he wrote their major songs.

The SNL Fifth Beatle skit pokes fun at Albert Goldman, the author of an unauthorized and controversial biography of John Lennon. Goldman, besieged by a group of reporters seeking comment on the book, confesses to holding a grudge against Lennon. The scene then dissolves into a black and white flashback showing the Beatles, with Goldman, at the "Cavern Club" in Liverpool, England, where the Beatles first performed in 1963. In the flashback, Goldman stands among the Beatles playing an incongruous instrument, the trombone, before a crowd of fans. The final scene of the SNL Fifth Beatle Skit depicts the Beatles firing Goldman from the band. Into the scene walks Elvis Presley, an allusion, according to the defendants' depositions, to the fact that Goldman had previously authored a stinging biography of the Memphis rock 'n roll idol.

Novak and Studer identify the following similarities between the two skits: both feature an interview, both make use of black and white film to portray an event occurring in the past, both make use of the term the "Fifth Beatle," both feature the Fifth Beatle as somewhat of a misfit who plays an incongruous instrument and is ultimately asked to leave the group.

■ In determining whether two works are "so substantially similar as to reveal an infringement of one by the other, courts must decide whether the similarities shared by the works are something more than mere generalized ideas or themes." *Warner Bros., Inc. v. American Broadcasting Cos.*, 654 F.2d 204, 208 (2d Cir.1981) ("*Warner I*"). As this court has pointed out in its first summary judgment opinion, such generalized themes, or "*scenes a faire*," are not copyrightable as a matter of law in the Second Circuit. *Novak v. National Broadcasting Co.*, 716 F.Supp. 745, 751 (S.D.N.Y.1989), *on reargument*, 724 F.Supp. 141 (S.D.N.Y.1989), citing *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979, (2d Cir.1980), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980).

This court has already found that "[a] fictional 'Fifth Beatle' is simply a concept, an idea, which has been used for various purposes in entertainment...." *Novak*, 716 F.Supp. at 752–53. The other points of similarity, the black and white film, the interview/talk show format, the use of flashbacks, are similarly *scenes a faire*. Such themes are analogous to other ideas that the Second Circuit has held to be *scenes a faire, e.g.*, super heroes lifting cars to demonstrate strength; the use of drunks, prostitutes and abandoned cars to portray the South Bronx. *Warner I*, 654

F.2d at 210 (superheros and cars); *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 50 (2d Cir.1986) (the South Bronx).

Another piece of evidence adduced by the defendants, a 1984 SNL skit featuring comedian Eddie Murphy playing a disgruntled Fifth Beatle, buttresses this court's finding that the alleged infringing elements of the SNL Fifth Beatle skit are *scenes a faire,* thus precluding a finding of substantial similarity between the copyrighted script and the allegedly infringing skit. The 1984 SNL skit makes use of the talk show format to portray Murphy as a misfit Beatle, a saxophone player, who left the group after a falling out but who nevertheless insists, not unlike Wingo Murray, that he gave the Beatles all their ideas for songs. The presence of the incongruous instrument, talk show format, and allegations of theft of ideas in the 1984 skit further illustrate that the allegedly infringing elements are the stock-in-trade of comedy writers who set about the task of portraying a Fifth Beatle, itself a stock theme.

As regards Novak and Studer's claim based on the Fifth Beatle skit, this court finds, then, that the issue of substantial similarity is not a genuine issue of fact. Even granting that the Defendants had access to the tape containing the Fifth Beatle skit, which itself is far from certain, Novak and Studer cannot make a prima facie of copying where there is no substantial similarity. Therefore, Novak and Studer had not succeeded in showing any material issues of fact so as to preclude a grant of summary judgment on this claim.

*Conclusion*

For the reason set forth above, summary judgment is granted dismissing the complaint.

It is so ordered.