**A. A. HOEHLING, Plaintiff-Appellant,**

v.

**UNIVERSÀL CITY STUDIOS, INC., and Michael MacDonald Mooney, Defendants-Appellees.**

**No. 692, Docket 79–7704.**

United States Court of Appeals, Second Circuit.

Argued Feb. 27, 1980.

Decided March 25, 1980.

James C. Eastman, Washington, D. C., for plaintiff-appellant.

Coudert Bros., New York City (Eugene L. Girden, New York City, of counsel), for defendant-appellee Universal City Studios, Inc.

Peter A. Flynn, and Myron M. Cherry, Chicago, Ill. (Cherry, Flynn & Kanter, Chicago, Ill., Hervey M. Johnson, White Plains, N. Y.), and James J. McEnroe, New York City (Watson, Leavenworth, Kelton & Taggert, New York City), for defendant-appellee Michael M. Mooney.

Before KAUFMAN, Chief Judge, TIMBERS, Circuit Judge, and WERKER, District Judge.*

IRVING R. KAUFMAN, Chief Judge:

■ A grant of copyright in a published work secures for its author a limited monopoly over the expression it contains. The copyright provides a financial incentive to those who would add to the corpus of existing knowledge by creating original works. Nevertheless, the protection afforded the copyright holder has never extended to history, be it documented fact or explanatory hypothesis. The rationale for this doctrine is that the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past. Accordingly, the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain. As the case before us illustrates, absent wholesale usurpation of another's expression, claims of copyright infringement where works of history are at issue are rarely successful.

I.

This litigation arises from three separate accounts of the triumphant introduction, last voyage, and tragic destruction of the Hindenburg, the colossal dirigible constructed in Germany during Hitler's reign. The zeppelin, the last and most sophisticated in a fleet of luxury airships, which punctually floated its wealthy passengers from the Third Reich to the United States, exploded into flames and disintegrated in 35 seconds as it hovered above the Lakehurst, New Jersey Naval Air Station at 7:25 p. m. on May 6, 1937. Thirty-six passengers and

* Of the United States District Court for the Southern District of New York, sitting by designation.

crew were killed but, fortunately, 52 persons survived. Official investigations conducted by both American and German authorities could ascertain no definitive cause of the disaster, but both suggested the plausibility of static electricity or St. Elmo's Fire, which could have ignited the highly explosive hydrogen that filled the airship. Throughout, the investigators refused to rule out the possibility of sabotage.

The destruction of the Hindenburg marked the concluding chapter in the chronicle of airship passenger service, for after the tragedy at Lakehurst, the Nazi regime permanently grounded the Graf Zeppelin I and discontinued its plan to construct an even larger dirigible, the Graf Zeppelin II.

The final pages of the airship's story marked the beginning of a series of journalistic, historical, and literary accounts devoted to the Hindenburg and its fate. Indeed, weeks of testimony by a plethora of witnesses before the official investigative panels provided fertile source material for would-be authors. Moreover, both the American and German Commissions issued official reports, detailing all that was then known of the tragedy. A number of newspaper and magazine articles had been written about the Hindenburg in 1936, its first year of trans-Atlantic service, and they, of course, multiplied many fold after the crash. In addition, two passengers—Margaret Mather and Gertrud Adelt—published separate and detailed accounts of the voyage, C. E. Rosendahl, commander of the Lakehurst Naval Air Station and a pioneer in airship travel himself, wrote a book titled *What About the Airship?*, in which he. endorsed the theory that the Hindenburg was the victim of sabotage. In 1957, Nelson Gidding, who would return to the subject of the Hindenburg some 20 years later, wrote an unpublished "treatment" for a motion picture based on the deliberate destruction of the airship. In that year as well, John Toland published *Ships in the Sky* which, in its seventeenth chapter, chronicled the last

flight of the Hindenburg. In 1962, Dale Titler released *Wings of Mystery*, in which he too devoted a chapter to the Hindenburg.[1]

Appellant A. A. Hoehling published *Who Destroyed the Hindenburg?*, a full-length book based on his exhaustive research in 1962. Mr. Hoehling studied the investigative reports, consulted previously published articles and books, and conducted interviews with survivors of the crash as well as others who possessed information about the Hindenburg. His book is presented as a factual account, written in an objective, reportorial style.

The first half recounts the final crossing of the Hindenburg, from Sunday, May 2, when it left Frankfurt, to Thursday, May 6, when it exploded at Lakehurst. Hoehling describes the airship, its role as an instrument of propaganda in Nazi Germany, its passengers and crew, the danger of hydrogen, and the ominous threats received by German officials, warning that the Hindenburg would be destroyed. The second portion, headed *The Quest*, sets forth the progress of the official investigations, followed by an account of Hoehling's own research. In the final chapter, spanning eleven pages, Hoehling suggests that all proffered explanations of the explosion, save deliberate destruction, are unconvincing. He concludes that the most likely saboteur is one Eric Spehl, a "rigger" on the Hindenburg crew who was killed at Lakehurst.

According to Hoehling, Spehl had motive, expertise, and opportunity to plant an explosive device, constructed of dry-cell batteries and a flashbulb, in "Gas Cell 4," the location of the initial explosion. An amateur photographer with access to flashbulbs, Spehl could have destroyed the Hindenburg to please his ladyfriend, a suspected communist dedicated to exploding the myth of Nazi invincibility.

Ten years later appellee Michael MacDonald Mooney published his book, *The Hin-*

1. Titler's account was published after the release of appellant's book. In an affidavit in this litigation, Titler states that he copied Hoehling's theory of sabotage. Hoehling, however, has never instituted a copyright action against Titler.

*denburg.* Mooney's endeavor might be characterized as more literary than historical in its attempt to weave a number of symbolic themes through the actual events surrounding the tragedy. His dominant theme contrasts the natural beauty of the month of May, when the disaster occurred, with the cold, deliberate progress of "technology." The May theme is expressed not simply by the season, but also by the character of Spehl, portrayed as a sensitive artisan with needle and thread. The Hindenburg, in contrast, is the symbol of technology, as are its German creators and the Reich itself. The destruction is depicted as the ultimate triumph of nature over technology, as Spehl plants the bomb that ignites the hydrogen. Developing this theme from the outset, Mooney begins with an extended review of man's efforts to defy nature through flight, focusing on the evolution of the zeppelin. This story culminates in the construction of the Hindenburg, and the Nazis' claims of its indestructibility. Mooney then traces the fateful voyage, advising the reader almost immediately of Spehl's scheme. The book concludes with the airship's explosion.

Mooney acknowledges, in this case, that he consulted Hoehling's book, and that he relied on it for some details. He asserts that he first discovered the "Spehl-as-saboteur" theory when he read Titler's *Wings of Mystery*. Indeed, Titler concludes that Spehl was the saboteur, for essentially the reasons stated by Hoehling. Mooney also claims to have studied the complete National Archives and New York Times files concerning the Hindenburg, as well as all previously published material. Moreover, he traveled to Germany, visited Spehl's birthplace, and conducted a number of interviews with survivors.

After Mooney prepared an outline of his anticipated book, his publisher succeeded in negotiations to sell the motion picture rights to appellee Universal City Studios.[2] Universal then commissioned a screen story by writers Levinson and Link, best known for their television series, *Columbo*, in which a somewhat disheveled, but wise detective unravels artfully conceived murder mysteries. In their screen story, Levinson and Link created a Columbo-like character who endeavored to identify the saboteur on board the Hindenburg. Director Robert Wise, however, was not satisfied with this version, and called upon Nelson Gidding to write a final screenplay. Gidding, it will be recalled, had engaged in preliminary work on a film about the Hindenburg almost twenty years earlier.

The Gidding screenplay follows what is known in the motion picture industry as a "Grand Hotel" formula, developing a number of fictional characters and subplots involving them. This formula has become standard fare in so-called "disaster" movies, which have enjoyed a certain popularity in recent years. In the film, which was released in late 1975, a rigger named "Boerth," who has an anti-Nazi ladyfriend, plans to destroy the airship in an effort to embarrass the Reich. Nazi officials, vaguely aware of sabotage threats, station a Luftwaffe intelligence officer on the zeppelin, loosely resembling a Colonel Erdmann who was aboard the Hindenburg. This character is portrayed as a likable fellow who soon discovers that Boerth is the saboteur. Boerth, however, convinces him that the Hindenburg should be destroyed and the two join forces, planning the explosion for several hours after the landing at Lakehurst, when no people would be on board. In Gidding's version, the airship is delayed by a storm, frantic efforts to defuse the bomb fail, and the Hindenburg is destroyed. The film's subplots involve other possible suspects, including a fictional countess who has had her estate expropriated by the Reich, two fictional confidence men wanted

---

**2.** Mooney, his publishers, and Universal entered into an agreement under which (1) Universal acquired the film rights to Mooney's book, (2) Universal agreed to promote sales of the book, and (3) Mooney would receive a percentage fee, tied to sales of his book. Hoehling claims that because of this arrangement, Universal is vicariously liable if Mooney's book, but not the motion picture, is held to infringe his copyright. In view of our disposition of the appeal, however, we need not address this issue.

by New York City police, and an advertising executive rushing to close a business deal in America.

Upon learning of Universal's plans to release the film, Hoehling instituted this action against Universal for copyright infringement and common law unfair competition in the district court for the District of Columbia in October 1975. Judge Smith declined to issue an order restraining release of the film in December, and it was distributed throughout the nation.

In January 1976, Hoehling sought to amend his complaint to include Mooney as a defendant. The district court, however, decided that it lacked personal jurisdiction over Mooney.[3] In June 1976, Hoehling again attempted to amend his complaint, this time to add Mooney's publishers as defendants. Judge Smith denied this motion as well, but granted Hoehling's request to transfer the litigation to the Southern District of New York, 28 U.S.C. § 1404(a), where Mooney himself was successfully included as a party. Judge Metzner, with the assistance of Magistrate Sinclair, supervised extensive discovery through most of 1978. After the completion of discovery, both Mooney and Universal moved for summary judgment, Fed.R.Civ.P. 56, which was granted on August 1, 1979.

## II.

▉ It is undisputed that Hoehling has a valid copyright in his book. To prove infringement, however, he must demonstrate that defendants "copied" his work and that they "improperly appropriated" his "expression." *See Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946). Ordinarily, wrongful appropriation is shown by proving a "substantial similarity" of *copyrightable* expression. *See Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). Because substantial similarity is customarily an extremely close question of fact, *see Arnstein, supra*, 154 F.2d at 468, summary judgment has tradi-

tionally been frowned upon in copyright litigation, *id.* at 474. Nevertheless, while *Arnstein*'s influence in other areas of the law has been diminished, *see SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978); 6 *Moore's Federal Practice* ¶ 56.17[14] (2d ed. 1976), a series of copyright cases in the Southern District of New York have granted defendants summary judgment when all alleged similarity related to *non*-copyrightable elements of the plaintiff's work, *see, e. g., Alexander v. Haley*, 460 F.Supp. 40 (S.D.N.Y.1978); *Musto v. Meyer*, 434 F.Supp. 32 (S.D.N.Y.1977); *Gardner v. Nizer*, 391 F.Supp. 940 (S.D.N.Y. 1975); *Fuld v. National Broadcasting Co.*, 390 F.Supp. 877 (S.D.N.Y.1975). These cases signal an important development in the law of copyright, permitting courts to put "a swift end to meritless litigation" and to avoid lengthy and costly trials. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980); *accord, Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir. 1972); *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 278 (2d Cir. 1967). Drawing on these cases, Judge Metzner assumed both copying and substantial similarity, but concluded that all similarities pertained to various categories of non-copyrightable material. Accordingly, he granted appellees' motion for summary judgment. We affirm the judgment of the district court.

### A

Hoehling's principal claim is that both Mooney and Universal copied the essential plot of his book—*i. e.*, Eric Spehl, influenced by his girlfriend, sabotaged the Hindenburg by placing a crude bomb in Gas Cell 4. In their briefs, and at oral argument, appellees have labored to convince us that their plots are not substantially similar to Hoehling's. While Hoehling's Spehl destroys the airship to please his communist girlfriend, Mooney's character is motivated by an aversion to the technological age. Universal's

---

**3.** At the same time, Judge Smith denied Universal's motion for summary judgment, concluding

it was inappropriate prior to the completion of requested discovery.

Boerth, on the other hand, is a fervent anti-fascist who enlists the support of a Luftwaffe colonel who, in turn, unsuccessfully attempts to defuse the bomb at the eleventh hour.

■ Although this argument has potential merit when presented to a fact finder adjudicating the issue of substantial similarity, it is largely irrelevant to a motion for summary judgment where the issue of substantial similarity has been eliminated by the judge's affirmative assumption. Under Rule 56(c), summary judgment is appropriate only when "there is no genuine issue as to any material fact." *Accord, Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317 (2d Cir. 1975). Perhaps recognizing this, appellees further argue that Hoehling's plot is an "idea," and ideas are not copyrightable as a matter of law. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir.), *cert. denied*, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936).

■ Hoehling, however, correctly rejoins that while ideas themselves are not subject to copyright, his "expression" of *his* idea is copyrightable. *Id.* at 54. He relies on Learned Hand's opinion in *Sheldon, supra*, at 50, holding that *Letty Lynton* infringed *Dishonored Lady* by copying its story of a woman who poisons her lover, and Augustus Hand's analysis in *Detective Comics, Inc. v. Bruns Publications, Inc.*, 111 F.2d 432 (2d Cir. 1940), concluding that the exploits of "Wonderman" infringed the copyright held by the creators of "Superman," the original indestructible man. Moreover, Hoehling asserts that, in both these cases, the line between "ideas" and "expression" is drawn, in the first instance, by the fact finder.

■ *Sheldon* and *Detective Comics*, however, dealt with works of fiction,[4] where the distinction between an idea and its expression is especially elusive. But, where, as here, the idea at issue is an interpretation of an historical event, our cases hold that such interpretations are not copyrightable as a matter of law. In *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), we held that the defendant's biography of Howard Hughes did not infringe an earlier biography of the reclusive alleged billionaire. Although the plots of the two works were necessarily similar, there could be no infringement because of the "public benefit in encouraging the development of historical and biographical works and their public distribution." *Id.* at 307; *accord, Oxford Book Co. v. College Entrance Book Co.*, 98 F.2d 688 (2d Cir. 1938). To avoid a chilling effect on authors who contemplate tackling an historical issue or event, broad latitude must be granted to subsequent authors who make use of historical subject matter, including theories or plots. Learned Hand counseled in *Myers v. Mail & Express Co.*, 36 C.O.Bull. 478, 479 (S.D.N.Y.1919), "[t]here cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection."[5]

■ In the instant case, the hypothesis that Eric Spehl destroyed the Hindenburg is based entirely on the interpretation of historical facts, including Spehl's life, his girlfriend's anti-Nazi connections, the explosion's origin in Gas Cell 4, Spehl's duty station, discovery of a dry-cell battery

---

4. In *Sheldon*, both works were loosely based on an actual murder committed by a young Scottish girl. Judge Hand, however, clearly dealt only with the fictional plots conceived by the respective authors. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir.), *cert. denied*, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936).

5. This circuit has permitted extensive reliance on prior works of history. *See, e. g., Gardner v. Nizer*, 391 F.Supp. 940 (S.D.N.Y.1975) (the

story of the Rosenberg trial not copyrightable); *Fuld v. National Broadcasting Co.*, 390 F.Supp. 877 (S.D.N.Y.1975) ("Bugsy" Siegel's life story not copyrightable); *Greenbie v. Noble*, 151 F.Supp. 45 (S.D.N.Y.1957) (the life of Anna Carroll, a member of Lincoln's cabinet, not copyrightable). The commentators are in accord with this view. *See, e. g.* 1 *Nimmer on Copyright* § 2.11[A] (1979); Chafee, *Reflections on the Law of Copyright: I*, 45 Colum.L.Rev. 503, 511 (1945).

among the wreckage, and rumors about Spehl's involvement dating from a 1938 Gestapo investigation. Such an historical interpretation, whether or not it originated with Mr. Hoehling, is not protected by his copyright and can be freely used by subsequent authors.

### B

The same reasoning governs Hoehling's claim that a number of specific facts, ascertained through his personal research, were copied by appellees.[6] The cases in this circuit, however, make clear that factual information is in the public domain. *See, e. g., Rosemont Enterprises, Inc., supra,* 366 F.2d at 309; *Oxford Book Co., supra,* 98 F.2d at 691. Each appellee had the right to "avail himself of the facts contained" in Hoehling's book and to "use such information, whether correct or incorrect, in his own literary work." *Greenbie v. Noble,* 151 F.Supp. 45, 67 (S.D.N.Y.1957). Accordingly, there is little consolation in relying on cases in other circuits holding that the fruits of original research are copyrightable. *See, e. g., Toksvig v. Bruce Publications Corp.,* 181 F.2d 664, 667 (7th Cir. 1950); *Miller v. Universal City Studios, Inc.,* 460 F.Supp. 984 (S.D.Fla.1978). Indeed, this circuit has clearly repudiated *Toksvig* and its progeny. In *Rosemont Enterprises, Inc., supra,* 366 F.2d at 310, we refused to "subscribe to the view that an author is absolutely precluded from saving time and effort by referring to and relying upon prior published material. . . . It is just such wasted effort that the proscription against the copyright of ideas and facts . . . . are designed to prevent." *Accord,* 1 *Nimmer on Copyright* § 2.11 (1979).

### C

The remainder of Hoehling's claimed similarities relate to random duplications of phrases and sequences of events. For example, all three works contain a scene in a German beer hall, in which the airship's crew engages in revelry prior to the voyage. Other claimed similarities concern common German greetings of the period, such as "Heil Hitler," or songs, such as the German National anthem. These elements, however, are merely *scenes a faire,* that is, "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Alexander, supra,* 460 F.Supp. at 45; *accord, Bevan v. Columbia Broadcasting System, Inc.,* 329 F.Supp. 601, 607 (S.D.N.Y.1971). Because it is virtually impossible to write about a particular historical era or fictional theme without employing certain "stock" or standard literary devices, we have held that *scenes a faire* are not copyrightable as a matter of law. *See Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976).

### D

All of Hoehling's allegations of copying, therefore, encompass material that is non-copyrightable as a matter of law, rendering summary judgment entirely appropriate. We are aware, however, that in distinguishing between themes, facts, and *scenes a faire* on the one hand, and copyrightable expression on the other, courts may lose sight of the forest for the trees. By factoring out similarities based on non-copyrightable elements, a court runs the

---

**6.** In detailed comparisons of his book with Mooney's work and Universal's motion picture, Hoehling isolates 266 and 75 alleged instances of copying, respectively. Judge Metzner correctly pointed out that many of these allegations are patently frivolous. The vast majority of the remainder deals with alleged copying of historical facts. It would serve no purpose to · review Hoehling's specific allegations in detail in this opinion. The following ten examples, however, are illustrative: (1) Eric Spehl's age and birthplace; (2) Crew members had smug- gled monkeys on board the Graf Zeppelin; (3) Germany's ambassador to the United States dismissed threats of sabotage; (4) A warning letter had been received from a Mrs. Rauch; (5) The Hindenburg's captain was constructing a new home in Zeppelinheim; (6) Eric Spehl was a photographer; (7) The airship flew over Boston; (8) The Hindenburg was "tail heavy" before landing; (9) A member of the ground crew had etched his name in the zeppelin's hull; and (10) The navigator set the Hindenburg's course by reference to various North Atlantic islands.

risk of overlooking wholesale usurpation of a prior author's expression. A verbatim reproduction of another work, of course, even in the realm of nonfiction, is actionable as copyright infringement. *See Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730 (1978). Thus, in granting or reviewing a grant of summary judgment for defendants, courts should assure themselves that the works before them are not virtually identical. In this case, it is clear that all three authors relate the story of the Hindenburg differently.

 In works devoted to historical subjects, it is our view that a second author may make significant use of prior work, so long as he does not bodily appropriate the expression of another. *Rosemont Enterprises, Inc., supra*, 366 F.2d at 310. This principle is justified by the fundamental policy undergirding the copyright laws—the encouragement of contributions to recorded knowledge. The "financial reward guaranteed to the copyright holder is but an incident of this general objective, rather than an end in itself." *Berlin v. E. C. Publications, Inc.*, 329 F.2d 541, 543–44 (2d Cir.), *cert. denied*, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). Knowledge is expanded as well by granting new authors of historical works a relatively free hand to build upon the work of their predecessors.[7]

### III

Finally, we affirm Judge Metzner's rejection of Hoehling's claims based on the common law of "unfair competition." Where, as here, historical facts, themes, and research have been deliberately exempted from the scope of copyright protection to vindicate the overriding goal of encouraging contributions to recorded knowledge, the states are pre-empted from removing such material from the public domain. *See, e. g., Sears, Roebuck & Co. v. Stiffel Co.*,

376 U.S. 225, 83 S.Ct. 1868, 10 L.Ed.2d 1050 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). "To forbid copying" in this case, "would interfere with the federal policy . . . of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." *Id.* at 237, 84 S.Ct. at 782.

The judgment of the district court is affirmed.

---

7. We note that publication of Mooney's book and release of the motion picture revived long dormant interest in the Hindenburg. As a result, Hoehling's book, which had been out of print for some time, was actually re-released after the film was featured in theaters across the country.