this case and motion to respond was present. I did inform the court of hardship of gaining legal material and the inner — jail law library system which is more often than not a lost battle. I can only now ask you to stay or pause future actions until the plaintiff is able to gain access to a functioning law library. At this time I have no other options other than to appeal to your wisedom in such a unfamiliar area to me. I am hopeful this will be drawn to the attention of Judge Richie.

I thank you deeply for any help you may render.

Sincerely yours,
Samuel A. Byrd, Jr.

Polly NELSON, Plaintiff,

v.

John GRISHAM, et al., Defendants.

Civil Action No. 95–0149 (RCL).

United States District Court,
D. Columbia.

Sept. 26, 1996.

Patricia D. Douglass, Washington, DC, for plaintiff.

Bruce W. Sanford, Belinda J. Scrimenti, Henry S. Hoberman, Baker & Hostetler, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on defendants' motion to dismiss or, in the alternative, for summary judgment. Upon consideration of the parties' submissions and the relevant law, for the reasons set forth below, the court will grant defendants' motion for summary judgment.

## I. Background

Plaintiff Polly Nelson has sued defendants John Grisham and Bantam Doubleday Dell Publishing Group, Inc., alleging copyright infringement arising under the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.* Plaintiff contends that Grisham copied her book, *Defending the Devil: My Story as Ted Bundy's Last Lawyer,* when Grisham wrote his novel, *The Chamber.* In response, defendants have moved for dismissal on the ground that the complaint does not properly allege that defendant Grisham had access to plaintiff's protected work, a necessary element of copyright infringement. In the alternative, defendants have moved for summary judgment on the ground that the books are not substantially similar, again a necessary element of copyright infringement. Before a discussion of the legal issues, a brief synopsis of each book is appropriate.

### A. Defending the Devil: My Story as Ted Bundy's Last Lawyer

Nelson has memorialized her three-year-long involvement in the representation of death row inmate Ted Bundy in *Defending the Devil.* After a brief description of her floundering path to the Washington, D.C. law firm Wilmer, Cutler & Pickering, Nelson tells how she received the Bundy case when she accepted it as a diversion from her normal regulatory work at the firm. She proceeds to describe three years of legal work on the Bundy case, including the appeals process, habeas corpus proceedings, scrambles for stays, her interaction with others in the firm, and the affect the work and publicity had on her personal and professional life.

In the Bundy habeas corpus litigation, the primary issue addressed by both the courts and the attorneys was the question of Bundy's competency to stand trial. This issue is also the primary focus of Nelson in her book. Nelson outlines in great detail the process of writing the appellate briefs, finding, interviewing, and preparing witnesses as well as convincing Bundy that their best chance of success involved the competency issue. An example of the incredible significance placed on this issue by Nelson is the approximately 100 pages of her book which are lifted from the transcript of the federal district court evidentiary hearing on Bundy's competency.

### B. The Chamber

*The Chamber* is the fictional story of Adam Hall's attempt to discover his hidden past through the last minute representation of his grandfather, Sam Cayhall. In 1967, Cayhall was involved, with two other men, in the bombing of a Jewish attorney's office. While Sam had thought the bomb was to go off in

the middle of the night, in fact his accomplice had added a timing device so that it detonated when the attorney was in the office with his twin sons. The boys were killed instantly, and the attorney suffered injuries to his legs that resulted in both being amputated.

Sam was arrested that very day, and soon charged with capital murder for the bombings. However, his first two trials both ended in mistrials, and it was not until 1981 that he was convicted and sentenced to die in the gas chamber. Nine years passed, and the appeals process has almost run its course. Enter Adam Hall, 26 year-old grandson of Sam. In 1967, just after Sam's arrest, Adam's father had taken his family away from Mississippi and fled to California. Adam and Sam had not communicated with each other since Adam was three. In fact, Adam did not learn of his infamous grandfather until after his father died when Adam was only 16.

*The Chamber* tells the story of Adam and Sam's relationship in the month leading up to Sam's execution. It describes the legal appellate process, but also the exploration process of Adam as he discovers the history of his grandfather, father, and aunt. Together, Sam and Adam grow as their relationship develops and Adam fights to prolong Sam's life.

## II.  Analysis

### A.  Legal Standard

Defendants have moved the court to dismiss this case under Rule 12(b)(6) arguing that under no set of facts can plaintiff prove that Grisham had access to the protected writings of Nelson and, in the alternative, for summary judgment on the issue of substantial similarity. However, because both parties have submitted evidence regarding access that is beyond the scope of the complaint, the court will treat the entire motion as one for summary judgment as provided by Rule 56.

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct.

2548, 2552–53, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If summary judgment is to be denied, there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment may be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

### B.  Access

To establish copyright infringement, two elements must be shown: (1) ownership of a valid copyright, and (2) copying of protectable elements of the copyrighted work. *Feist Publications v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358 (1991). Because plaintiffs can rarely provide direct evidence of copying, plaintiffs can raise the inference of copying by demonstrating that the alleged infringer had access to the protected work and that the works are substantially similar. *McCall v. Johnson Publishing Co.*, 680 F.Supp. 46, 48 (D.D.C.1988).

With regards to access, this is an unusual case in that *Defending the Devil* was published after *The Chamber*. Plaintiff alleges that Grisham copied from earlier drafts, as opposed to the final published version. It is undisputed that a 1989 proposal for *Defending the Devil* was sent to sixteen publishing houses. It is not evident if Doubleday, Grisham's publisher, was one of these sixteen. However, it appears undisputed that plaintiff submitted a 68 page proposal and draft to Doubleday publishers in 1990. Because Doubleday serves as Grisham's publisher, plaintiff wishes the court to infer that the proposal was passed around at Doubleday and eventually landed in the hands of Grisham. Furthermore, plaintiff has alleged that Grisham was exposed to a complete draft, which was completed in 1993. Plaintiff has pre-

sented no direct evidence that Doubleday ever had possession of this draft. Instead, plaintiff asks the court to infer that Doubleday had access because in the publishing industry, unpublished manuscripts are often circulated. To refute this inference, defendants have produced affidavits from Grisham and others at Doubleday who deny ever having read the proposal. As weak as the suggested inference is, summary judgment on the issue of access would be inappropriate at this time, before completion of discovery. But, plaintiff's case fails for another reason making the question of access ultimately irrelevant. *See McCall,* 680 F.Supp. at 48.

## C. Substantial Similarity

■ As stated earlier, copying of protected works is a required element of copyright infringement.[1] Because direct evidence of copying is often difficult to find, plaintiffs can raise the inference of copying by showing both access and substantial similarity. Defendants argue that because these two books are not substantially similar, copyright infringement cannot be proven. When substantial similarity is an issue, summary judgment for a defendant is "appropriate where the works are so dissimilar that a claim of infringement is without merit." *Twentieth Century–Fox Film Corp. v. MCA, Inc.,* 715 F.2d 1327, 1330 (9th Cir.1983). Or, as the Second Circuit has stated, "when no reasonable trier of fact could find the works substantially similar." *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 48 (2d Cir.), cert. denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986).

Copyright protection "does not extend to ideas; it protects only the means of expression employed by the author." *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 68 (2d Cir.1994). Judge Learned Hand articulated the guiding principle in applying this concept that is much easier stated than used:

> upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the general statement of what the play is about, and at times consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). Thus, "the focus must be on the similarity of the expression of an idea or fact, not on the similarity of the facts, ideas, or concepts themselves." *Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). And while an alleged infringer cannot prove his innocence by pointing to the differences in his work, "numerous differences tend to undercut substantial similarity." *Warner Bros. Inc. v. American Broadcasting Co.,* 720 F.2d 231, 241 (2d Cir.1983).

■ The plaintiff has submitted over 100 pages of charts created by herself that she argues document many similarities between the two books. Additionally, she has submitted a lengthy declaration of Jack Jorgens as an expert witness and both parties have submitted numerous critical reviews of both works. However, for several reasons, the court does not place much significance on these materials in reaching its decision. First of all, in any case involving substantial similarity, the actual texts are the relevant evidence. "Comparison of secondary or descriptive materials cannot prove substantial

---

1. Plaintiff has asked the court to compare the two works in their entirety to determine if Grisham copied *Defending the Devil,* and, if the answer is yes, to then determine if the copying was of protectable or unprotectable elements. However, this is not the approach of the Second Circuit, which is by far the most experienced in matters of copyright infringement. Courts are to limit their inquiry to determine whether "the protectable elements, standing alone, are sub-

stantially similar." *Williams v. Crichton,* 84 F.3d 581, 588 (2d Cir.1996) (quoting *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1002 (2d Cir. 1995)). The court adopts the approach of the Second Circuit, confident in its belief that this is the law. Having said this, it is important to note that the court does address the general concept and feel of each book in its entirety, and concludes that the two works are very different.

similarity under the copyright laws." *Walker*, 784 F.2d at 51. Second, with regards to the declaration of Jack Jorgens and the other critical analyses, expert testimony is not relevant in a case such as this when the question of substantial similarity "depends on the observations of the 'ordinary reasonable person.'" *McCall*, 680 F.Supp at 48 (quoting *Sid and Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977)).[2] And, having examined the charts produced by Nelson, the court questions their usefulness as many of the textual examples appear to be taken out of context and in fact allege similarity when there is none to be found. For example, row 107 asks the court to consider the similarity between two sentences in *The Chamber* found on pages 43 and 48 with a paragraph from *Representing the Devil* found on page 158. In *The Chamber*, Adam is viewing a videotape that he had spent seven years making. The videotape pieces together the legal trials of Sam from the day of the crime to the present day. In *Representing the Devil*, Nelson had just spent part of an unsuccessful day with her supervising attorney looking for footage of her client's trial. They were unsuccessful because they could only locate brief excerpts. The only apparent similarity between the indicated passages is that they both involve videotapes of the attorney's clients. When the passages are examined, it is clear that they are not similar and that they serve very different purposes. In *The Chamber*, Adam had spent years creating this videotape of Sam in an attempt to learn everything he could about his grandfather. Grisham uses the making of the tape as a device to show Adam's intense fascination with his recently discovered past. In contrast, Nelson and her boss had spent a few hours at the end of a day looking for the tapes in hopes that they could be used as evidence. The search for the tapes is just another example of the effort exerted by Nelson to help Bundy on a day-to-day basis.

Additionally, many of the scenes and descriptions pointed to in the tables, even if they are similar, are "scenes a faire". which are not copyrightable. Scenes a faire are "sequences of events that 'necessarily result from the choice of a setting or situation' [and] do not enjoy copyright protection." *Williams*, 84 F.3d at 587 (quoting *Walker*, 784 F.2d at 50). In *Walker*, the works involved in the infringement dispute were a book and a movie about police work in New York City. In finding that almost all similarities between the two books involved unprotectable materials, the Second Circuit concluded that elements such as "drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the policemen in the South Bronx." *Walker*, 784 F.2d at 50. Similarly, foot chases and the morale problems of cops are stock themes in police fiction and are unprotectable as well, except to the extent that they are given unique expression. *Id.* Nelson has alleged as similarities in each of the books the presence of the media, politicians, and jail house personnel. Furthermore, she points to the similar frenzy with which last minute appeals are made by each of the attorneys. But, these are all stock events and scenes that are expected in any book about the representation of a death row inmate. And, because Grisham did not copy any unique expressions of Nelson, there is no infringement.

### a. Concept and Feel

In determining substantial similarity, courts must consider both the works as a whole and their individual parts. Explaining the need for this, the Second Circuit stated that "just as similarity cannot be rejected by isolating as an idea each characteristic the characters have in common, it cannot be

---

2. In the Second Circuit, the standard "ordinary reasonable person" test has been modified by some courts because of a belief that the concept of substantial similarity is not one known to the public at large. Thus, substantial similarity is a "term to be used in a courtroom to strike a delicate balance between the protection to which authors are entitled under an act of Congress and the freedom that exists for all others to create their works outside the area protected against infringement." *Warner Bros., Inc. v. American Broadcasting Co.*, 654 F.2d 204, 207 (2d Cir.1981). Because of this, the court is not rejecting as irrelevant the declaration of Jack Jorgens. But, the court questions the many conclusions reached by Jorgens, and therefore has focused on the actual texts of the two books.

found when the total perception of all the ideas as expressed in each character is fundamentally different." *Warner Brothers*, 720 F.2d at 243.

The concept and feel of the two books are very different. *Defending the Devil* is nonfictional account of Nelson's attempt to save Bundy from the electric chair. She believed that there was a valid error in each of Bundy's trials that should be addressed on appeal, and *Defending the Devil* is about her fight to have his convictions overturned. There is no suspense or surprise about the eventual outcome as the first page in the book is a newspaper account of Bundy's execution. Many pages of the book consist of testimony from the district court and appellate proceedings, lifted straight from the transcripts as if Nelson wishes to also convince the reader of the validity of Bundy's claim. While the case undoubtedly had an effect on Nelson's personal life, her personal growth and whatever relationships that might have developed as a result of her representation are not the focus of the book.

In contrast, *The Chamber* is novel that tells a much more personal story. While the reader learns about Adam's legal representation of Sam, this is not the reason for the story, or for the actions of the characters. Even though he does not like it, Adam knows that there are probably not any viable issues left in Sam's case, and although he wants to represent Sam in order to help him legally, it is to help him in other ways as well. Adam wants Sam to know that he has family, and Adam wants to learn about his familial history. Adam's legal representation of Sam is the vehicle for the character development of each.

b. Plot, Setting, and Time Line

The setting of each book is different. In *Defending the Devil*, the majority of the action takes place in Washington, D.C., the location of Nelson's law firm, and in Florida, where Bundy was eventually executed. In *The Chamber*, most of the action takes place in Chicago and Memphis, the location of Adam's legal offices, and in Mississippi, where Sam is in prison. The choice of Mississippi is an important one for *The Cham-*

*ber*, as the southern state provides the backdrop for the racial issues that led to Sam's decision to participate in the bombings. His southern upbringing influenced him greatly, and it is this part of his heritage that Adam wishes to explore. Additionally, the choice of Mississippi allowed Grisham to draw comparisons between the state's politics and those of Texas and Florida, two southern states that lead all others in the number of executions that take place every year.

While the southern backdrop does play a significant role in *The Chamber*, plaintiff is right that much of the action in both books takes place in offices, courtrooms, prisons, and hotels. Plaintiff argues that the descriptions of these settings are "remarkably similar." However, the court finds this statement to be inaccurate. And, the similarities that do exist are not copyrightable as they consist of descriptions that are too general to be deserving of copyright protection. *See Hoehling v. Universal City Studios*, 618 F.2d 972, 979 (2d Cir.1980).

The plot and time line of the books are also very different. Nelson covers a three-year period in her book while the action in *The Chamber* takes place in only one month. While *Defending the Devil* opens with Bundy under an execution warrant, it is a first execution warrant and there is little question that a stay will be granted. And, Nelson takes the reader through three years worth of appeals, from the daily grind of working on a capital case to the actual court hearings. In stark contrast, *The Chamber* does not have the same day-to-day-grind, but only intense activity as when the book opens, Sam is under an execution warrant that most do not expect to be stayed.

c. Characters

Plaintiff argues that Adam and Nelson are substantially similar characters. And, if plaintiff's characterizations of the two protagonists were accurate, there might be some validity to this argument. But, in fact, the protagonists are portrayed very differently in the two books. Admittedly, both are recent law school graduates who, as associates in large law firms, represent death row inmates. But, the similarities end there.

Even though she claims to have been born to represent Ted Bundy, in reality Nelson was asked to take the case simply because she was the closest associate still in the office late one evening. *Defending the Devil* at 20. And, in the book Nelson did not originally accept the case because of a deep need to help others as she has alleged in her brief, but because the pro bono case was "[a]nother diversion from the work at hand, like manna from heaven." *Defending the Devil* at 19. Several times in the book, Nelson recounts how she asked to be let off of the case, but is refused each time. Nelson may have been stuck with the Bundy litigation, but it was not just her inner turmoil that led to this situation.

In stark contrast, Adam was in the midst of multi-year plan when he asked to become involved in the representation of his grandfather, Sam Cayhall. Adam became a lawyer because of a longing to help his grandfather. He chose his law firm because of their past representation of his grandfather. In contrast, Nelson chose her law firm because she was suspicious of the fun she had encountered at her other place of legal employment. *Defending the Devil* at 16.

Plaintiff argues that both attempt to avoid the realities of the crimes their clients committed. And Nelson does avoid looking at pictures of Bundy's victims for a very long time. But, very early in *The Chamber*, Adam is seen replaying a tape he has created that tells of the many trials of Sam Cayhall. And, instead of ignoring the victims, there is what Adam describes as a "pitiful accident" that involves one of Cayhall's victims who lost both of his legs due to the bombing. And, instead of skipping over the scene, Adam discusses how he first had tears when he watched the scene, but has seen it so many times that tears are no longer possible. *The Chamber* at 49. And, unlike Nelson who does not even indirectly discuss Bundy's crimes with him until nine months after her involvement began, *Defending the Devil* at 127, Adam has only been with Sam for approximately four to five minutes when he asks him point blank if he admits to killing his victims. *The Chamber* at 78.

Plaintiff also argues that both protagonists experience many of the same emotions, such as anxiety, protectiveness, hatred, and exhaustion. Certainly most who represent prisoners who face execution experience anxiety and exhaustion. And, protectiveness and hatred are easy to imagine in such a emotionally-charged experience as each protagonist has. Thus these are stock themes that cannot be accorded copyright protection. *Walker*, 784 F.2d at 50.

Plaintiff has also argued that the two inmates, Sam and Ted, are similar characters. Again, a reading of the two books does not support this argument. Sam was the lookout man in a series of crimes against Jewish Southerners who were targeted because of their aid to blacks and the civil rights movement. Except for a last ditch attempt to stay the execution, there was never any question regarding Sam's mental state or competency. He participated in his crimes because of racial hatred.

In contrast, Bundy was a serial killer who attacked, raped and murdered women. Through his entire involvement with the legal process, there was always a question about his competency, and Nelson focused on this throughout the book.

Nelson also argues that the two inmates are described in similar ways. At one point or another, both are resigned, ready to argue anything, and ready to argue nothing. But, again, these conflicting emotions are ones the court would expect from a death row inmate facing an impending execution, and because Grisham did not copy any unique expression of these ideas, there is no infringement. And, again, many of the alleged similarities are simply not similarities. For example, in each book both Sam and Ted are described as considering themselves "invincible." However, the reasons that each considers himself to be invincible only illustrate how very different the two characters are. Early in *The Chamber*, Sam considers himself invincible when he has successfully completed a number of bombings without being caught. *The Chamber*, p. 5. Later, he considers himself to be invincible because he has been through two trials, and the state is unable to convict him. *Id.* at 106. In contrast, Ted is

described as acting as if he is invincible as a result of his mental illness, not because of external factors that he thought demonstrated the state's inability to convict him. *Defending the Devil*, p. 152.

Plaintiff has expressed concern that a ruling against her will be a dangerous acknowledgment that those who write their own memoirs cannot expect to receive protection from the copyright laws. The court responds in two ways, as the Second Circuit did in *Williams v. Crichton.* In that case, the plaintiff was an author of children's books, and was concerned about the level of protection that he was receiving under the copyright laws. In answering this concern, the court stated that "the copyright law is to be uniformly applied across a variety of media and audiences." *Williams,* 84 F.3d at 590. Just as children's literature receives equal protection under the copyright laws, so does non-fiction work. But this protection does not change the fact that often in non-fiction work there are many uncopyrightable elements. The court recognizes that *Representing the Devil* is about more than just Bundy's life. In parts, Nelson has injected her personal experience as well, and her expression of her experiences receives protection under the law. But, giving her this protection does not give her the right to claim a monopoly on the stories of young attorneys who represent inmates on death row. And, giving her this protection cannot create substantial similarity where none exists. It is most important to point out that her claim fails because the two works are not substantially similar. An exhaustive examination of both books leads the court to conclude that no reasonable trier of fact could conclude that the two works are substantially similar.

III. Conclusion

Because of the factual nature of substantial similarity, courts have at times hesitated to grant summary judgment. *See Hoehling v. Universal City Studios,* 618 F.2d 972, 977 (2d Cir.), cert. denied, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). However, as the Second Circuit has stated, the use of summary judgment is "an important development ... permitting courts to put 'a swift end to meritless litigation' and to avoid lengthy and costly trials." *Hoehling,* 618 F.2d at 977 (2d Cir.), (quoting *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980)). Summary judgment is appropriate in this case because the claim of infringement of the plaintiff is meritless.

A separate order shall issue this date.

### ORDER

For the reasons expressed in the Court's accompanying Memorandum Opinion, it is

ORDERED that defendants' Motion for Summary Judgment is GRANTED, and it is further

ORDERED that this case is DISMISSED.

SO ORDERED.